**Opinion issued April 17, 2025.**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-24-00894-CV**

———————————

## IN THE INTEREST OF Z.J.G., J.R.G. AND N.L.G., CHILDREN

———————————

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Case No. 2023-01629J**

———————————

## MEMORANDUM OPINION

In this accelerated appeal, Mother and Father challenge the trial court's order terminating their parental rights to their children, "Zachary," "James," and "Naomi."[1] Mother argues on appeal that the evidence is legally and factually insufficient to support: (1) the trial court's termination of her parental rights under Texas Family Code section

---

[1] We refer to the parties using the pseudonyms adopted by the parties. *See* TEX. R. APP. P. 9.8(b)(2).

161.001(b)(1)(D) (knowingly placing or allowing the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child), (E) (engaging in conduct or knowingly placing the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child), (O) (failure to comply with the provisions of a court order establishing the necessary actions for the parent to obtain return of the child), and (P) (using a controlled substance in a manner that endangered the child's health or safety) of the Texas Family Code; and (2) the trial court's termination of her parental rights under section 161.001(b)(2) (termination is in the best interest of the child).

Father argues on appeal that the evidence is legally and factually insufficient to support: (1) the trial court's termination of his parental rights under section 161.001(b)(1)(E) (engaging in conduct or knowingly placing the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child), and (2) the trial court's termination of his parental rights under section 161.001(b)(2) (termination is in the best interest of the child). Both Mother and Father argue on appeal that the evidence is legally and factually insufficient to support the trial court's finding that appointment of the Texas Department of Family and Protective Services (the Department) as managing conservator was in the children's best interest. We affirm.

## Background

This appeal concerns three siblings: Zachary, James, and Naomi. At the time of trial, Zachary was five years old and James was two years old. Naomi turned one year old between the start and end dates of the trial.

### A. The Department's Removal of the Children

The Department's caseworker assigned to the case testified at trial that the children were brought to the Department's attention when the Department received allegations of substance abuse and domestic violence in the children's home. The alleged domestic violence was between Father and Mother. It was also alleged that the home might be a "flophouse," or "trap house," with people coming in and out of the house, staying for short periods, possibly to do drugs. Both parents admitted to drug use, and the caseworker did not view the environment as being safe for the children.

The Department elected to seek Temporary Conservatorship of Zachary, James, and Naomi. On July 10, 2023, the Department filed its Original Petition for Protection of a Child for Conservatorship and for Termination in Suit Affecting the Parent-Child Relationship. The Department sought removal of the children due to issues including substance abuse by Mother and Father, as well as what the Department believed was Mother's untreated depression and anxiety. The trial

court appointed the Department the Emergency Temporary Sole Managing Conservator of the children, and set a full adversary hearing for July 18, 2023.

## B. Subsequent Proceedings

The trial court held a full adversary hearing on July 18, 2023, pursuant to section 262.201 of the Texas Family Code. On that same date, the trial court appointed the Department the children's Temporary Managing Conservator and ordered Father and Mother to comply with the Department's Family Plans of Service.

Under Mother and Father's Family Plans of Service, both were required to: (1) maintain and provide proof of stable employment; (2) maintain stable and appropriate housing free from safety hazards; (3) refrain from all criminal activity; (4) attend and actively participate in parent/child visits; (5) successfully complete parenting classes; (6) submit to drug testing including twice-monthly urinalysis tests and a random hair test every three months; (7) participate in drug, alcohol, and substance abuse evaluations and follow all recommendations; and (8) complete a psychosocial assessment and follow all recommendations. Father was also required to successfully complete domestic violence classes and give the Department the names of three individuals who are his support system outside his household.

The trial court conducted a permanency hearing on March 26, 2024, which both Mother and Father attended in person and through their respective counsel. After the hearing, the trial court issued an order finding that Mother and Father had not demonstrated adequate and appropriate compliance with their Family Plans of Service, which the trial court incorporated by reference and made part of the trial court's Permanency Hearing Order Before Final Order. The trial court found further that returning the children to their home was not safe, appropriate, or in their best interest; that neither Mother nor Father were willing and able to provide the children with a safe environment; and that the children thus had substitute care needs.

## C.  Trial

A bench trial was held over three days: June 25, August 28, and October 1, 2024. On the first day of trial, the trial court admitted exhibits including the following:

- P-1: the executed citation for Mother;

- P-2 to P-4: the children's birth certificates;

- P-8 to P-9: orders establishing Father as the children's biological father;

- P-10: the trial court's July 18, 2023 order after the adversary hearing;

- P-11: Mother's signed Family Plan of Service;

- P-12: Father's signed Family Plan of Service;

5

- P-13: the trial court's order after a September 19, 2023 status hearing;

- P-14: the trial court's order after its December 13, 2023 permanency hearing;

- P-15: the Department's June 13, 2024 Permanency Report;

- P-16 and P-17: drug test results for Mother (showing that on July 18, 2023 Mother tested positive for methamphetamine, and that in April 2024 Mother tested positive for amphetamine and methamphetamine); and

- P-18 and P-19: documents certifying that Father did not appear for court-ordered drug testing in December 2023 and April 2024.

The Department's June 13, 2024 Permanency Report included information about the Department's prior investigations of Mother in 2021 and 2022. The Permanency Report included some of Mother's drug testing history to date, including a series of refused tests and, for one test not refused (in December 2023), a positive result for amphetamine and methamphetamine. The Permanency Report also included some of Father's drug testing history, consisting of a series of refused tests, and a May 9, 2024 misdemeanor charge for tampering with a drug test that was later dismissed.

### 1. Caseworker

The first two days of trial, June 25, 2024 and August 28, 2024, the trial court heard testimony from caseworker Tyese Craig. Craig is the Department caseworker assigned to the children's case. Craig prepared Mother and Father's Family Plans

6

of Service, summarized above. Through Craig's work with Mother and Father, the Department had tried to help Mother and Father reunify with their children, including by preparing Mother and Father's Family Plans of Service; maintaining communication with the children, Mother, Father, and foster parents; and facilitating in-person visits between the children and Mother and Father. Craig testified the barriers to reunification include the substance abuse of Mother and Father, lack of a stable home environment, and lack of means to care for the children.

Craig's testimony focused on Mother and Father's compliance with their Family Plans of Service. For example, with regard to the requirement that the Mother and Father maintain and provide proof of stable employment, she testified that neither Mother nor Father was employed, and that neither had provided the required proof of income. She noted that Mother claimed to be looking for work and had worked at times as a housekeeper.

With regard to the requirement that Mother and Father maintain stable and appropriate housing free from safety hazards, Craig testified that the home environment provided by Mother and Father was not safe for the children, and that Mother and Father were unable to offer their children a safe and stable environment. She testified to multiple places that Mother and Father claimed or were said to be living over time, together or separately, including her

7

understanding that Mother and Father were staying in a series of hotel rooms, that Mother was staying in a FEMA-funded hotel room, and that Father was staying with a friend. She also noted her understanding that, at one point, the Mother and Father were homeless. Mother told Craig that she was no longer in a relationship with Father, but Craig observed that Mother and Father always showed up together for visits with their children.

With regard to the requirement that the Mother and Father refrain from all criminal activity, Craig testified that she believed Father had no criminal history or drug convictions.

With regard to the requirement that Mother and Father attend and actively participate in parent/child visits, Craig testified that Mother and Father both regularly attended their scheduled visits with their children, missing only a small number of visits, but that only Mother maintained any other contact with the Department. Mother and Father had been permitted visits with their children twice a month, for two hours each visit. Craig described the visits as "appropriate," as going "pretty good," and as going "well." To Craig's knowledge, Mother never came to a visit under the influence. She noted that Father was not as involved as Mother in parenting the children during the visits. But both Father and Mother would give the children gifts at the visits, like clothes, toys, or food.

With regard to the requirement that Mother and Father successfully complete parenting classes, Craig testified that Father had not even started the parenting classes. Mother had started but not completed the parenting classes.

With regard to the requirement that Mother and Father submit to drug testing including twice-monthly urinalysis test and a random hair test every three months, Craig testified that both Mother and Father admitted to drug use. Neither Mother nor Father routinely submitted to the twice-monthly urinalysis testing. Father did not participate in any of the drug testing requested of him. Each test not taken was considered by the trial court to be a positive result. Craig testified that the only drug tests with which Mother complied were the tests in December 2023 and April 2024, which resulted in the positive test results for amphetamine and/or methamphetamine described above. (As noted above, Mother appears to have also tested positive for methamphetamine in July 2023, soon after Naomi was born.) While Mother and Father were always able to find transportation to their visits with their children, Mother said early in the case that transportation issues prevented her from complying with the drug testing. Father said early in the case that he might get fired from his job if he went to the drug tests. Though, as noted above, Father never provided any proof of employment.

With regard to the requirement that Mother and Father participate in drug, alcohol, and substance abuse evaluations and follow all recommendations, Craig

did not testify as to whether Father had completed those evaluations. However, when asked if Mother and Father had completed a drug assessment, she responded: "[Mother] did complete a drug assessment." She testified that Mother had completed her substance abuse assessment and a recommended psychological assessment. But Craig also noted that Mother had not completed recommended outpatient substance abuse therapy. Mother was discharged from that therapy after missing three therapy appointments. Mother had voluntarily admitted herself to in-patient "rehab" treatment twice but, each time, she left the program without completing it—the second time to "go back to" Father. Craig testified that Mother has not actively worked on her sobriety since leaving the in-patient rehab treatment.

With regard to the requirement that Mother and Father complete a psychosocial assessment and follow all recommendations, Craig said that Father had not completed his requested psychosocial evaluation. Mother had completed the psychosocial evaluation, but had not verified completion of the trauma therapy recommended based on that evaluation. Craig noted, however, that Mother agreed to the recommended trauma therapy, but remained on the provider's wait list, indicating the provider did not have availability for her. Craig's view was that, given Mother could not remain sober, the therapy would not have been effective.

With regard to the requirement that Father successfully complete domestic violence classes, Craig did not testify as to whether Father complied with that requirement. She testified that allegations of domestic violence between Father and Mother were one of the reasons the children were brought to the Department's attention in the first place. The allegations of domestic violence of which she was aware related to a period before the two youngest children were born. She was not aware of any allegations of domestic violence occurring since the case was initiated.

With regard to the requirement that Father give the Department the names of three individuals who are his support system outside his household, Craig testified that Father did not provide the names of family members who could care for the children if his rights were restricted or lost.

In summary, Craig testified that, at the start of the case, reunification of Mother and Father with the children had been the Department's goal, noting the Department prefers reunification "if at all possible" because it is the best result for the children. She said she had made diligent efforts to work with Mother and Father and explain to them the importance of their completing the requested services. But Mother and Father had not taken full advantage of the services offered to them—or any advantage, in Father's case. Craig had to reorder services for Father multiple times because he would not take advantage of them, and the

orders would expire. Compared to Father, Mother did work a significant amount of services. But neither parent took advantage of the services offered to them so they could be considered for reunification.

Indeed, Craig reported that, in the year she had been on the case, nothing had changed in terms of the services offered to Mother and Father. Craig did not believe that either parent had demonstrated an ability to care for the children's physical or emotional needs, or that giving them additional time to engage in the services offered to them would change that. She testified that "we're going in circles" and that, if Mother and Father were given more time, they would not do anything with it - "it's just going to be excuse after excuse."

Craig testified that Mother's and Father's refusal to participate in drug testing, and Mother's leaving rehab, is what ultimately caused the Department to change its goal from reunification to unrelated adoption in January 2024. Due to Mother's positive drug tests, non-compliance with other drug tests, and failure to complete her drug treatment, the Department would not consider reunification of Mother and her children. Craig noted that there are safety concerns with returning a child to a parent who is testing positive for methamphetamines.

Craig acknowledged that the children love and are bonded to both Mother and Father. She acknowledged that, if the children never see Mother again, it will be traumatic—especially for Zachary. But, in Craig's view, neither Mother nor

12

Father had been able to demonstrate the ability to meet their children's emotional and physical needs. In her view, the Department could not send the children back to a home with parents who had failed repeatedly to take requested drug tests and, when they did take the tests, tested positive for methamphetamines. She testified that exposing the children to drug use and domestic violence would also be traumatic.

Craig noted that the Department had initiated a home study with the children's aunt, but that the aunt had told the Department that she and her husband could not take on the care of all three children given their work schedules. Neither of Mother's parents was an option for caregiver.

Craig testified that the children had been together in a foster home since July 2023, with the goal of a possible adoption by the foster parents. She said that the children were "doing great" in the foster home. They were stable and bonded in their foster home, and their physical and emotional needs were being met. At the time of the trial, the children were one, two, and five years old. To the extent that Zachary, the eldest, had expressed a preference, he had said he wanted to go back home with Mother or his aunt. But he had not really spoken much about it.

Craig noted that the Department was requesting to be named Permanent Managing Conservator of all three children. She testified that the Department recommended terminating the parental rights of both Mother and Father. Craig

13

believed termination of Mother and Father's parental rights would be in the children's best interest and would give the children the permanency they need.

### 2. Mother

After Craig's testimony, the Department rested. The trial court took a short recess during which the trial court asked counsel for Mother and Father to talk with their clients. When the trial proceeded later that morning, Mother took the stand. Upon being sworn in, Mother stated she did not want to testify. When her counsel asked her a question about a possible compromise resolution under which she would accept a termination of her parental rights but only on the basis of just one of the alleged grounds, she responded: "I can't do this right now. I really can't. I need some more time. . . . I need to know what all my options are. . . . I want the chance to have my kids back again if later on down the line I get my ducks in a row." Given the trial would thus proceed, and an additional day would be needed, the trial court recessed for the day.

Trial concluded on October 1, 2024. Neither parent was present. Craig was recalled, and testified that neither Mother nor Father had completed any services or participated in any drug testing since she last testified in August.

### 3. Foster Mother

The children's foster mother testified next. Foster Mother testified that the children had been with her and her husband since July 2023. She said that they

were "fantastic children," who were "doing well," "thriving," and "growing." Mother had tested positive for methamphetamine days after Naomi was born, and Foster Mother testified that Naomi had arrived in their home a very colicky baby who slept a lot and was not eager to feed. Naomi had since overcome those difficulties, was growing, and meeting all her milestones. Naomi was very bonded to her foster parents and her brothers.

Foster Mother said that James was "doing fantastic." When he first arrived at the foster parents' home, she said that he "didn't have any words." The foster parents had him tested several times but, ultimately, "he just needed some extra help." At the time of trial, at just shy of 17 months old, James was "exceeding expectations." Foster Mother said that James was "ahead of the curve at this point."

Zachary was four years old when he came to live with foster parents. Foster Mother noted that, at that time, Zachary struggled with lashing out physically when he did not get his way. Zachary also "very much parented" James. The foster parents addressed the former issue with play therapy and behavioral help, and the latter by reinforcing for Zachary that he does not need to be the parent, that he can be just a kid. The brothers have "a great sibling bond" that is "amazing to watch."

Foster Mother testified that, if the trial court were to terminate the parental rights of the children's biological parents, she and her husband were willing and

able to give the children a permanent home. They "would be honored" to adopt the children. Foster Mother stated that she and her husband were willing and able to continue to meet all the children's emotional and physical needs, and give them the stability they need, noting that the children "deserve the world and more."

### 4. Foster Father

Foster Father testified that, if asked the same questions that his wife had answered, he would answer the same.

### D. Termination

On May 16, 2023, the trial court signed a final decree of termination, finding that clear and convincing evidence existed to support findings as to Mother under Texas Family Code sections 161.001(b)(1)(D) (knowingly placing or allowing the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child), (E) (engaging in conduct or knowingly placing the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child), (O) (failure to comply with the provisions of a court order establishing the necessary actions for the parent to obtain return of the child), and (P) (using a controlled substance), and that termination of Mother's parental rights to the children was in the children's best interests. The trial court also found that clear and convincing evidence existed to support findings as to Father under Texas Family Code sections 161.001(b)(1)(E) (engaging in conduct

or knowingly placing the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child) and (O) (failure to comply with the provisions of a court order establishing the necessary actions for the parent to obtain return of the child), and that termination of Father's parental rights to the children was in the children's best interests. This appeal followed.

## Sufficiency of the Evidence

### A.    Standard of Review

In a case to terminate parental rights under section 161.001 of the Texas Family Code, the Department must establish that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and (2) termination is in the best interest of the child. TEX. FAM. CODE § 161.001(b). Only one predicate finding under Section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). The Department must prove both elements—i.e., both the statutorily prescribed predicate finding(s) and that termination is in the child's best interest—by clear and convincing evidence. *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). The Family Code defines "clear and convincing evidence" as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

17

When assessing the legal sufficiency of the evidence in a termination proceeding, we consider all evidence in the light most favorable to the trial court's finding and decide "whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *see also City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005) (discussing elevated standard of review in parental termination cases). We assume that any disputed facts were resolved in favor of the finding if a reasonable factfinder could have done so. *In re J.F.C.*, 96 S.W.3d at 266. When "no reasonable factfinder could form a firm belief or conviction" that the matter on which the Department bears the burden of proof is true, we "must conclude that the evidence is legally insufficient." *Id*. In reviewing the evidence's factual sufficiency, we consider the entire record, including disputed evidence. *Id*. The evidence is factually insufficient if, considering the entire record, the disputed evidence that a reasonable factfinder could not have resolved in favor of the finding is so significant that the factfinder could not reasonably have formed a firm belief or conviction. *Id*.

We give due deference to the factfinder's findings, and we cannot substitute our own judgment for that of the factfinder. *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). The factfinder is the sole arbiter when assessing the credibility and demeanor of witnesses. *See id*. at 109.

## B. Applicable Law

Protection of the best interest of the child is the primary focus of the termination proceeding in the trial court and our appellate review. *See In re A.V.*, 113 S.W.3d at 361. A parent's rights to the "companionship, care, custody, and management" of a child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). Accordingly, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20-21 (Tex. 1985).

Here, the trial court terminated Mother's rights under section 161.001(b)(1)(D), (E), (O), and (P), and Father's rights under section 161.001(b)(1)(E) and (O). The Texas Supreme Court has held that, because subsection (M) provides a basis to terminate parental rights due to a prior subsection (D) or (E) finding, due process concerns coupled with the requirement for a meaningful appeal require that, if an appellate court affirms a termination order based on a (D) or (E) finding, the court must provide the details of its analysis. *See In re N.G.*, 577 S.W.3d 230, 236–37 (Tex. 2019). Because Mother challenges the trial court's findings under subsections (D) and (E), and Father challenges the trial court's finding under subsection (E), thus implicating due

process concerns, we start our sufficiency of the evidence analysis with these two subsections. *See id.*; *In re Z.M.M.*, 577 S.W.3d 541, 542–43 (Tex. 2019).

## C.     Predicate Findings Under Section 161.001(b)(1)(D) and (E)

In Mother's first through fourth issues, she challenges the sufficiency of the evidence to support the trial court's termination of her parental rights under, respectively, subsections (D), (E), (O), and (P) of section 161.001(b)(1) of the Family Code. In Father's first issue, he challenges the sufficiency of the evidence to support the trial court's termination of his parental rights under subsection (E).

Section 161.001(b)(1)(D) of the Family Code provides that the trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(D). Section 161.001(b)(1)(E) provides that the trial court may terminate a parent's rights if the trial court finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child.

Subsection (E) focuses on the parent's conduct and asks whether the parent engaged in a voluntary, deliberate, and conscious course of conduct that endangered the child. *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No.

03-19-00531-CV, 2020 WL 544797, at *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.). "Endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment. *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). In this context, endanger means to expose a child to loss or injury or to jeopardize a child's emotional or physical well-being. *Id.*; *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam). "Environment" refers to the acceptability of living conditions, as well as a parent's conduct in the home. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist] 2014, pet. denied). A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards. *Id.* Under subsection (E), courts may consider conduct both before and after the Department removed the child from the home. *In re J.A.R.*, 696 S.W.3d 245, 254 (Tex. App.—Houston [14th Dist.] 2024, pet. denied); *In re J.D.G.*, 570 S.W.3d 839, 851 (Tex. App.—Houston [1st Dist.] 2018, pet. denied).

Termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *In re S.R.*, 452 S.W.3d at 360. A court may consider actions and inactions occurring both before and after a child's birth to establish a "course of conduct." *In re J.A.R.*, 696 S.W.3d at 254. While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a

21

child or that the child actually suffers injury; rather, the specific danger to the child's well-being may be inferred from parents' misconduct alone. *Boyd*, 727 S.W.2d at 533; *In re N.J.H.*, 575 S.W.3d 822, 831 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (mem. op.). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re J.S.*, 584 S.W.3d 622, 635 (Tex. App.—Houston [1st Dist.] 2019, no pet.). The Department does not need to establish that a parent intended to endanger a child to support termination based on endangerment. *See In re M.A.J.*, 612 S.W.3d 398, 407 (Tex. App.—Houston [1st Dist.] 2020, pet. denied). Under subsection (E), the evidence must show that the endangerment was the result of the parent's conduct, including acts, omissions, or a failure to act. *In re K.P.*, 498 S.W.3d 157, 171 (Tex. App.—Houston [1st Dist.] 2016, pet. denied).

Evidence of a parent's illegal drug use may support termination under Subsection (E). *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re J.C.P.L., Jr.*, No. 01-24-00723-CV, 2025 WL 757159, at *5 (Tex. App.—Houston [1st Dist.] Mar. 11, 2025, no pet. h.) (mem. op.). The Supreme Court of Texas recently clarified that, "[w]hile illegal drug use alone may not be sufficient to show endangerment, a pattern of drug use accompanied by circumstances that indicate related dangers to the child can establish a substantial *risk* of harm." *In re R.R.A.*, 687 S.W.3d 269, 278 (Tex. 2024) (emphasis in original). Drug-use evidence

22

should not be evaluated in isolation; rather, it should be considered alongside evidence showing that "illegal drug use presents a risk to the parent's 'ability to parent.'" *Id*. (quoting *In re J.O.A*., 283 S.W.3d at 345); *see also In re A.V*., 697 S.W.3d 657, 659 (Tex. 2024) (characterizing *R.R.A*. standard as "holistic endangerment review"). For example, a parent's decision to continue to use drugs during the termination proceedings, even though the parent's parental rights were in jeopardy, has been cited as evidence of a voluntary, deliberate, and conscious course of conduct that, by its nature, endangered a child's well-being. *In re J.C.P.L.*, No. 01-24-00723-CV, 2025 WL 757159, at *6 (citing *In re E.G.A*., Nos. 01-24-00204-CV, 01-24-00206-CV, 2024 WL 3941021, at *17 (Tex. App.— Houston [1st Dist.] Aug. 2024, pet. denied) (mem. op.)); *see also In re A.V*., 697 S.W.3d at 659 (citing "parents' drug use continued despite their knowledge that their parental rights were subject to termination for continued drug use" as part of "a pattern of continued substantial risk of harm to the child sufficient to support a trial court's finding of endangerment"). Similarly, a parent's decision to continue using drugs during a pregnancy "supports a finding of direct injury to the child." *In re A.V*., 697 S.W.3d at 659.

This Court has previously held that "[i]nappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in the home is a part of the 'conditions or

surroundings' of the child's home under section D." *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). An analysis of endangerment under subsection (D) focuses on evidence of the child's physical environment, "although the environment produced by the conduct of the parents bears on the determination of whether the child's surroundings threaten his well-being." *Id.*; *see also In re S.R.*, 452 S.W.3d at 360 ("'Environment' refers to the acceptability of living conditions, as well as a parent's conduct in the home."). Termination is permissible under subsection (D) if the Department proves that the parent's conduct caused a child to be placed or remain in an endangering environment, and, under subsection (D), termination may be based upon only a single act or omission. *Jordan*, 325 S.W.3d at 721.

A parent's pattern of illegal drug use, and the effect on the parent's life and parenting ability, may establish not just endangering conduct under subsection (E), but also an endangering environment under subsection (D). *See In re R.R.A.*, 687 S.W.3d at 281.

In this case, both Mother and Father admitted to the Department their illegal drug use. The trial court ordered Mother and Father to submit to drug testing as required by their Family Plans of Service, including twice-monthly urinalysis tests and a random hair test every three months. The trial court also ordered additional spot-check urinalysis and hair tests on an episodic basis. Father submitted to none

of the requested or required tests in any of these categories. Mother submitted to just two or three of such tests. The caseworker testified that the only drug tests with which Mother complied were the tests in December 2023 and April 2024. The December 2023 test was positive for amphetamine and methamphetamine. The April 2024 test was also positive for amphetamine and methamphetamine. The trial exhibits included an additional test result from July 2023, when Mother tested positive for methamphetamine.

Mother and Father's repeated refusals to participate in drug testing—consistent in Father's case and near-consistent in Mother's case—are evidence of ongoing drug use. *See In re D.Y.V.-M.*, No. 14-24-00427-CV, 2024 WL 4984209, at *13 (Tex. App.—Houston [14th Dist.] Dec. 5, 2024, pet. denied) (mem. op.) (citing mother's failure during suit to participate in court-ordered drug testing as evidence of ongoing drug use). Indeed, as the Family Plans of Service made clear, a failure to complete required testing was considered to be a positive result. *See In re J.H.G.*, No. 01-16-01006-CV, 2017 WL 2378141, at *6 (Tex. App.—Houston [1st Dist.] June 1, 2017, pet. denied) (mem. op.) (father's failure to participate in court-ordered drug test is equivalent to positive test result); *In re I.W.*, No. 14-15-00910-CV, 2016 WL 1533972, at *6 (Tex. App.—Houston [14th Dist.] Apr. 14, 2016, no pet.) (mem. op.) (stating that parent's "refusal to submit to [a] drug test may be treated by the trial court as if he had tested positive for drugs").

We have also held that a parent's failure to complete drug treatment as required by a Family Plan of Service can be reasonably interpreted as evidence that the parent would continue to use illegal drugs and endanger the child's future. *In re E.G.A.*, No. 01-24-00204-CV, 2024 WL 3941021, at *17 (Tex. App.—Houston [1st Dist.] Aug. 27, 2024, pet. denied) (mem. op.) (citing *In re J.O.A.*, 283 S.W.3d at 346). Here, the trial court could reasonably have interpreted the evidence as showing that Father did not participate in the required drug, alcohol, and substance abuse evaluations that were to have determined what inpatient or outpatient drug treatment he might need. When asked if Father had "ever worked or tried to work any of his services," the caseworker testified that he had not. She also testified that she had to reissue the paperwork for Father's services multiple times because Father would not do the services when she ordered them, and the paperwork would expire. And when she was asked if Mother and Father had completed a drug assessment, she responded that Mother had done so.

In addition, the Department's June 13, 2024 Permanency Report lists Father as "not compliant" with the requirement that he participate in a substance abuse assessment, states that both Mother and Father "continue to refuse to test and/or test positive," and states that "[n]either parent has alleviated the Department's concerns of substance abuse." Mother completed her substance abuse assessment, but the caseworker testified that Mother had not completed recommended

26

outpatient substance abuse therapy. Indeed, Mother was discharged from that therapy after missing three therapy appointments. Also, Mother had voluntarily admitted herself to in-patient "rehab" treatment twice but, each time, she left the program without completing it. According to the caseworker, Mother left the second time in September 2023 to "go back with the children's father," and has not actively worked on her sobriety since then. Given these were actions by Mother and Father while they faced possible termination of their parental rights for failing to submit to an assessment and follow any resulting drug treatment recommendations, the trial court could reasonably have interpreted this as evidence that Mother and Father would continue to use illegal drugs and endanger their children's future.

While not addressed in the caseworker's testimony at trial, there is also evidence in the record that Mother used illegal drugs during and soon after her pregnancy with Naomi, who was born in July 2023. The trial exhibits include a drug test result from July 18, 2023, less than two weeks after Naomi was born, when Mother tested positive for methamphetamine. Mother's Family Plan of Service also noted that Mother had "admitted and tested positive for Amphetamines while pregnant." Drug use while a mother is pregnant can reasonably be interpreted as part of a pattern of behavior establishing endangerment even under the Texas Supreme Court's ruling in *In re R.R.A. See In*

27

*re A.V.*, 697 S.W.3d at 659; *see also In re J.C.P.L.*, 2025 WL 757159, at \*6 (citing father's continued relationship with mother, who used marijuana during pregnancy, as part of pattern of behavior establishing endangerment under *R.R.A.*); *see also In re A.R.D.*, 694 S.W.3d 829, 840 (Tex. App.—Houston [14th Dist.] 2024, pet. denied) ("Drug abuse during pregnancy constitutes conduct that endangers a child's physical and emotional well-being.").

In sum, the record contains evidence that: (1) both Mother and Father have been using illegal drugs fairly consistently since around the time Naomi was born and, at least in Mother's case, since Mother was pregnant with Naomi; (2) Mother used illegal drugs while pregnant despite the risk of harm to Naomi; (3) Mother and Father both used illegal drugs while Naomi was a newborn—and while her brothers James and Zachary were just a year and a half and four years old, respectively—both before and after the children had been placed in a foster home within a few weeks of Naomi's birth; (4) throughout the year that the Department was investigating Mother and Father for alleged neglect of their children, which could potentially lead to termination of their parental rights, Mother and Father continued using illegal drugs; (5) despite his parental rights being contingent on participating in drug testing and treatment during that year, Father complied with none of the drug-related requirements in his Family Plan of Service; (6) despite her parental rights being contingent on participating in drug testing and treatment

28

during that year, Mother failed to submit to most of her drug testing, tested positive for methamphetamine and/or amphetamine each time she did submit to testing, and did not complete required outpatient drug treatment because she missed too many treatment sessions.

Further, the caseworker testified that the Department had received allegations of domestic violence in the children's home. The alleged domestic violence was between Father and Mother. The allegations of domestic violence of which the caseworker was aware related to a period before the two youngest children were born. She was not aware of any allegations of domestic violence occurring since this case was initiated. Still, Father was required, as part of his Family Plan of Service, to successfully complete domestic violence classes. The caseworker did not testify specifically as to whether Father completed those classes. However, when asked if Father had "ever worked or tried to work any of his services," the caseworker testified that he had not. She also testified that she had to reissue the paperwork for Father's services multiple times because Father would not do the services when she ordered them, and the paperwork would expire. "Domestic violence and a propensity for violence may be considered evidence of endangerment, even if the endangering acts did not occur in the children's presence, were not directed at the children, or did not cause actual injury to the children." *In re J.B.M.*, No. 04-18-00717-CV, 2019 WL 1139858, at *2

(Tex. App.—San Antonio Mar. 13, 2019, pet. denied) (mem. op.). Similarly, endangerment may occur when an environment creates the potential for danger that the parent is aware of but disregards, *In re E.R.W.*, 528 S.W.3d 251, 264 (Tex. App.—Houston [14th Dist.] 2017, no pet.), such as when a parent continues to live with someone who committed instances of domestic violence. *In re G.M.*, 649 S.W.3d 801, 809 (Tex. App.—El Paso 2022, no pet.); *In re M.V.*, 343 S.W.3d 543, 547 (Tex. App.—Dallas 2011, no pet.).[2]

The trial court could reasonably have interpreted the above evidence regarding the risk of Mother and Father exposing the children to drugs and violence as showing a pattern of continued substantial risk of harm to the children sufficient to support its finding of endangerment under subsections (D) and (E).

Because we conclude the evidence is legally and factually sufficient to support the trial court's finding under Section 161.001(b)(1)(D) and (E) as to both Mother and Father, we overrule Mother's first and second issues and Father's first issue. We need not address Mother's third and fourth issues—i.e., that the evidence is legally and factually insufficient to support the trial court's findings under,

---

[2]  The caseworker noted that Mother denied any ongoing relationship with Father, but also her doubts that the two had truly separated. For example, she testified that Mother had left her inpatient drug treatment for the second time in September 2023 to "go back to" Father. She also expressed doubt regarding the parents' statements that they were not living together, noting that they always showed up together for visits with their children.

respectively, section 161.001(b)(1)(O) and (P). *See In re A.V.*, 113 S.W.3d at 362 (stating only one predicate finding is necessary).

### D.    Best Interest of the Children

In Mother's fifth issue and Father's second issue, Mother and Father contend that the evidence is legally and factually insufficient to support the trial court's finding that termination of their parental rights was in their children's best interest. *See* TEX. FAM. CODE § 161.001(b)(2).

There is a strong presumption that the best interest of a child is served by keeping the child with the child's natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE § 263.307(a).

Courts may consider the following non-exclusive factors in reviewing the sufficiency of the evidence to support the best interest finding: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the

home or proposed placement; (8) the acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). These factors are not exhaustive, and evidence is not required on each factor to support a finding that terminating a parent's rights is in the child's best interest. *Id.*; *In re D.R.A.*, 374 S.W.3d at 533. Moreover, we note that evidence supporting termination under one of the grounds listed in Section 161.001(b)(1) can also be considered in support of a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (holding same evidence may be probative of both section 161.001 grounds and best interest).

In addition, the Texas Family Code sets out factors to be considered in evaluating the parent's willingness and ability to provide the child with a safe environment, including: the child's age and physical and mental vulnerabilities; whether there is a history of substance abuse by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and

nutritional care, a safe physical home environment, and protection from repeated exposure to violence even though the violence may not be directed at the child; and an understanding of the child's needs and capabilities. TEX. FAM. CODE § 263.307(b); *In re R.R.*, 209 S.W.3d at 116.

### 1. Children's Desires

When the trial began, Zachary had just turned five and the two younger children were two and one years old. The two younger children were too young to express their desires. *In re A.J.H.*, No. 01-18-00673-CV, 2019 WL 190091, at *7 (Tex. App.—Houston [1st Dist.] Jan. 15, 2019, no pet.) (mem. op.) (finding that child under three was too young to express desires). When a child is too young to express her desires, the fact-finder may consider whether the child has bonded with the proposed adoptive family, is well-cared for by them, and whether she has spent minimal time with a parent. *See In re S.R.*, 452 S.W.3d at 369. A child's need for permanence through the establishment of a "stable, permanent home" has been recognized as the paramount consideration in a best interest determination. *See In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.). Therefore, evidence about the present and future placement of the child is relevant to the best interest determination. *In re J.E.M.M.*, 532 S.W.3d 874, 889 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

Weighing against termination of the parental rights of Mother and Father is the caseworker's undisputed testimony that the children are bonded with and love their biological parents. The caseworker believed that, if the children never see Mother again, it will be traumatic—especially for the oldest, Zachary. Indeed, the caseworker testified that Zachary had said he wanted to go back home with Mother or his aunt, though she added the qualification that he had not spoken much about it. Weighing in favor of termination, the evidence shows that the children are also bonded with their foster parents. The two younger children have lived with their foster parents longer than they lived with their biological parents. There is testimony that the foster parents meet all the children's physical, medical, and emotional needs and care, and offer stability. And because they wish to adopt all three children, the foster parents offer permanence. These factors all weigh in favor of termination of Mother and Father's parental rights. *See Holley*, 544 S.W.2d at 372; TEX. FAM. CODE § 263.307(b).

### 2. Children's Needs and Parental Abilities of Those Seeking Custody

The record includes evidence that (1) at the time they were placed in foster care, the children had medical or developmental issues; and (2) after a year in foster care, these issues had largely or entirely abated. For example, Foster Mother testified that Zachary, who was four when he went to his foster home, "struggle[d] with lashing out physically to [his foster parents] whenever he didn't get his way,"

34

and "also very much parented" his younger brother, James. The foster parents addressed the physicality issue with play therapy and behavioral help, and Zachary no longer physically lashes out at them. In foster care, Zachary has also learned that he is not responsible for parenting James and can just "be a kid."

Foster Mother testified that James, who was one when he went to his foster home, "didn't have any words"—presumably meaning that he was non-verbal—when he arrived. His foster parents had James tested for autism, for hearing loss, and for other possible deficits. However, according to Foster Mother, James "just needed some extra help." After assistance from an Early Childhood Intervention specialist, James is now "exceeding expectations" and "ahead of the curve."

Naomi was less than a month old when she went into foster care. Foster Mother testified that she was a "very colicky" baby who slept a lot. Foster Mother said that she and her husband were advised that, due to Naomi's prenatal exposure to drugs taken by Mother, they would need to "wake her often to feed her and even then it was a struggle to get her to feed." In foster care, in the year before trial, Naomi improved and was (at the time of trial) "growing" and "meeting all of her milestones."

The caseworker's testimony supported the foster parents' testimony. She testified that the children were "doing great" in the foster home. They were stable

and bonded, and their physical and emotional needs were being met. She believed it would be in the children's best interest if the parental rights of Mother and Father were terminated, and it would give the children the permanency they need.

In the year before trial, neither of the children's biological parents was ever able to show the Department proof of employment or a permanent residence. Those facts could reasonably be viewed as suggesting that Mother and Father would not be any better placed going forward to provide better care for the children than the care that had led to the medical and developmental issues confronting the children at the time they were placed into foster care.

This evidence of the children's biological and foster parents' differing abilities to meet the children's needs weighs in favor of termination. *See Holley*, 544 S.W.2d at 372; TEX. FAM. CODE § 263.307(b).

### 3. Present and Future Emotional and Physical Danger to Children

A parent's past conduct is probative of her future conduct when evaluating the child's best interest. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.). Thus, the evidence discussed in support of the trial court's findings under section 161.001(b)(1)(E) is probative as to potential danger in determining the children's best interest. *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 619 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

We have detailed above Mother and Father's pattern of routinely permitting their drug use to interfere with the care of their children. Even knowing that he could lose his parental rights to the children, Father made no effort to comply with those of his Family Plan of Service requirements related to drug use and treatment. Mother made some efforts but was unable to demonstrate any serious or extended commitment to compliance. A parent's substance abuse supports a finding that termination is in the best interest of the child. *In re E.R.W.*, 528 S.W.3d at 266 (noting factfinder can give "great weight" to "significant factor" of drug-related conduct); *see also In re Z.H.*, No. 14-19-00061-CV, 2019 WL 2632015, at *6 (Tex. App.—Houston [14th Dist.] June 27, 2019, no pet.) (mem. op.) (considering parent's drug use in the context of evaluating the present and future emotional and physical danger to the child).

We have also detailed above evidence that the trial court could reasonably have concluded was evidence of a risk that children would be exposed to incidents or the consequences of domestic violence by Father, who appears to have not completed the domestic violence classes required by his Family Plan of Service.

Because the record contains evidence showing that Mother and Father's drug use would persist, as well as the possibility that Mother would continue to expose herself to domestic violence and thus present a future emotional danger to

the children, this factor also weighs in favor of termination. *See Holley*, 544 S.W.2d at 372; TEX. FAM. CODE § 263.307(b).

Viewing the evidence in the light most favorable to the trial court's finding that termination of Mother and Father's parental rights was in their children's best interest, we conclude the trial court could have formed a firm belief or conviction that its finding was correct. *See In re J.F.C.*, 96 S.W.3d at 266. Further, looking at the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination of Mother and Father's parental rights was in the children's best interest. *Id.*

We thus overrule Mother's fifth issue and Father's second issue.

### E. Appointment of Sole Managing Conservator

Mother and Father argue, in their sixth and third issues, respectively, that the trial court abused its discretion by appointing the Department as the sole managing conservator of the children because, according to Mother and Father, the Department failed to introduce sufficient evidence demonstrating that Mother and Father would harm the children.

When the parental rights of all living parents of a child are terminated, the trial court must appoint a "competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." TEX. FAM. CODE § 161.207(a); *see In re S.M.M.*, No. 01-22-00482-CV,

2022 WL 17981669, at *12 (Tex. App.—Houston [1st Dist.] Dec. 29, 2022, pet. denied) (mem. op.); *In re J.D.G.*, 570 S.W.3d at 856. Conservatorship determinations are reviewed for an abuse of discretion and will be reversed only if the decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In re J.D.G.*, 570 S.W.3d at 856. An order terminating the parent-child relationship divests a parent of legal rights and duties with respect to the child. *See* TEX. FAM. CODE § 161.206(b). Once we overrule a parent's challenge to an order terminating her parental rights, the trial court's appointment of the Department as sole managing conservator may be considered a "consequence of the termination." *In re J.D.G.*, 570 S.W.3d at 856; *In re A.S.*, 261 S.W.3d 76, 92 (Tex. App.— Houston [14th Dist.] 2008, pet. denied).

Because we have overruled Mother and Father's challenges to the trial court's order terminating their parental rights, the order divested them of their legal rights and duties related to the children. See TEX. FAM. CODE § 161.206(b); *In re J.D.G.*, 570 S.W.3d at 856. Consequently, Mother and Father lack standing to challenge the portion of the order appointing the Department as the children's conservator. *See In re N.E.*, No. 01-22-00739-CV, 2023 WL 2530197, at *1 (Tex. App.—Houston [1st Dist.] Mar. 16, 2023, pet. denied) (mem. op.) (affirming termination of mother's parental rights and holding that mother, who had been divested of her legal rights to child, lacked standing to challenge portion of order

appointing Department as child's conservator); *In re S.M.M.*, 2022 WL 17981669, at *12 (affirming termination of father's parental rights and holding that father, who had been divested of his legal rights to child, lacked standing to challenge portion of order appointing Department as child's conservator); *In re J.D.G.*, 570 S.W.3d at 856 (same).

We overrule the Mother's sixth issue and the Father's third issue.

## Conclusion

We affirm the trial court's decree of termination.

Amparo "Amy" Guerra
Justice

Panel consists of Justices Guerra, Caughey, and Morgan.

40